IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>IPwe, Inc.,[1]<br><br>              Debtor. | Chapter 11<br>Subchapter V<br><br>Case No. 24-10078 |

## DECLARATION OF LEANN PINTO IN SUPPORT OF THE DEBTOR'S CHAPTER 11 PETITION AND FIRST DAY MOTIONS

I, Leann Pinto, hereby declare under penalty of perjury:

1. I am the Chief Executive Officer of IPwe, Inc. (the "Debtor" or "IPwe"), a corporation organized under the laws of the State of Delaware with its principal place of business in Dallas, TX.

2. I have been serving as Chief Executive Officer of the Debtor since approximately April 2023. Prior to that date, I served as President of the Debtor beginning August 2022 when I first joined the company.

3. I submit this declaration ("Declaration") in support of the Debtor's chapter 11, subchapter V bankruptcy petition and in support of the Debtor's "first day" motions and applications, described in further detail below (collectively, the "First Day Motions"). I am over 18 years of age and am competent to make this Declaration and testify to the facts set forth herein.

4. I, or those employees of the Debtor under my supervision, am generally familiar with the Debtor's day-to-day operations, business and financial affairs, and books and records. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with current and former officers and other members of the Debtor's management team, senior personnel, and advisors, my review of relevant documents and information concerning the

---

[1] The last four digits of the Debtor's federal tax identification number are 4619. The Debtor's address is 2515 McKinney Avenue, Suite 100B, Dallas, Texas 75201.

Debtor's operations and financial affairs as well as the Debtor's books and records, or my opinions based upon my experience and knowledge. If called as a witness to testify in this matter, I could and would testify competently to the facts set forth in this Declaration. I am authorized to submit this Declaration on behalf of the Debtor.

5. On the date hereof (the "Petition Date"), the Debtor filed its voluntary petition (the "Petition") for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code") commencing the above-captioned bankruptcy case (the "Case"). It is anticipated that the Debtor will continue to manage its affairs and operate their businesses as Debtor and Debtor-in-possession pursuant and subject to the requirements of sections 1107(a) and 1108 of the Bankruptcy Code.

6. I am familiar with the contents of each First Day Motion (including the exhibits to such motions) and believe the relief sought in each First Day Motion will allow for an orderly transition of the Debtor into this Case and permit the Debtor to achieve their bankruptcy objectives as further described below.

7. Part I of this Declaration describes the Debtor's business, capital structure and the events leading to the filing of the Petition. Part II of this Declaration sets forth the First Day Motions[2] and sets forth the relevant facts in support of those motions.

## Background

### A. History of the Debtor

8. Debtor was founded in January of 2018 as a financial technology company with a vision to change how people engage with, manage, transact and value intellectual property ("IP") assets, starting with patents, using artificial intelligence/machine learning and blockchain. Despite

---

[2] Capitalized terms not defined herein have the meanings ascribed to them in the First Day Motions.

various necessary shifts in the business model, including creation of a global patent registry database and launch of small pools of patents around emerging technology areas like blockchain, the overall vision for IPwe has not changed significantly even though the journey has taken far longer than originally anticipated. Fundamental behavioral changes in how the IP asset class is managed have only recently come to bear. IPwe acquired a similar company known as ClearAccessIP on April 11, 2020, gaining access to its algorithm, software code, client lists and employees. In June 2022, IPwe obtained funding from its largest outside investor Clarivate and gained access to their first in class IP datasets and a sales channel partner, finally enabling it to execute on creation of its flagship product, a web-based software platform called Smart Intangible Asset Management ("SIAM"). IPwe formally launched SIAM in January 2023 and obtained approximately 15 clients over the course of the first 3 quarters of the fiscal year that were interested in the valuations, analytics, data and comparables provided by a subscription to IPwe's solution. IPwe's SIAM is more than an IP management system, it is an IP strategy tool that enables conversations across the business about an emerging asset class in language that everyone—legal to business, IP and finance professionals—understands: currency. IPwe's algorithm as communicated through SIAM is objective, unbiased, consistent and refreshed weekly to provide real-time valuations of all active issued patent assets worldwide. It's the information owners need to be smarter and more productive in running their business. IPwe soon realized that it needed to fully rely on channel partners for sales due to long sales cycle for the software and the large amount of education that was necessary to make IP portfolio professionals and managers understand there is a better, easier, trusted way to manage strategy development and finance professionals that they can manage IP assets like other financial assets. The business model is based on Annual Recurring Revenue (ARR), with a SIAM subscription providing full access to unlimited users within the client company to enable conversations and strategy development across the business. The company went out to the market in 2018 to take in equity capital to assist the company in growing

its product and development and creation of its operations. Capital was infused in 2018, 2019, 2020, 2021, 2022 and 2023. Additionally, the company took on debt service as additional form of cash. Deals with James Pallotta (Raptor Group), Alpana Ventures, Nicole Shanahan, Kyle Bass, Clarivate and other investors helped to infuse cash at critical times of growth and operational pressure.

9. Debtor has remained in the market to take on additional equity capital throughout its existence, but particularly during the 2023 time frame, especially once it became clear in the second quarter that the deal cycle was going to be much longer than anticipated and the software as a service market has slightly shifted towards a data feed service model. Despite upwards of 50 meetings with potential investors over the course of the year, Debtor was unable to get to terms with any interested parties. Debtor was near to terms with one investor but that deal fell apart in the fourth quarter of 2023 when they experienced a downturn in their business due to the volatility of the capital markets over the course of the calendar year. Alternate financing options were explored, but none were able to be concluded, particularly in view of short time frame since Debtor launched its SIAM software platform. Accordingly, Debtor negotiated with the proposed DIP Lendor Granicus IP, LLC, as it had previously infused the company with cash at critical times of growth and operational pressure and currently holds a promissory note.

**B. Debtor's Business Operations**

10. IPwe, Inc. is a Delaware based corporation. The Debtor's corporate headquarters is located at 2515 McKinney Ave., Suite #1000-B, Dallas, TX 75201

**C. Organizational Structure, Governance, and Current Management**

11. The Debtor has a board that consists of the following members: Jane Mattheiu (representative from investor Corner Capital); Brian Berman, and Leann Pinto. We have two open seats on the board as well that are currently not filled.

12. The Debtor's' current operational management consists of myself, Leann Pinto, as CEO; Howard Goodman, Chief Accounting Officer, along with Nathan Bohn, Chief Technology Officer, and Jonas Block, Head of Product. Other individuals employed, including the VP of Marketing (Maria Mixan) and Chief Revenue Office (Jonathan Brown), ceased their employment with Debtor as of approximately November 2023.

**D. Capital Structure**

13. The equity structure of IPwe, Inc. is as follows (covering the major shareholders):

| Holder | Percentage |
|---|---|
| ELS 1960 Family LP | 27% |
| Camelot UK BidCo Ltd | 9.8% |
| Dan Bork | 3.2% |
| Pascal Asselot | 3.2% |
| Corner Sky | 2.8% |
| 24th Parallel Holdings | 2.7% |
| NS Family Trust | 2.5% |
| Bradley Rotter | 1.75% |
| Blue Palm Capital LLC | 1.5% |
| Alpana Ventures | 1.3% |

14. As of the Petition Date, the Debtor had secured debt of $3,305,215.15 as follows:

| Creditor | Amount |
|---|---|
| Granicus IP LLC | $2,322,215.15. |
| Marshall and Hall Consulting LLC | $983,000 |

15. As of the petition date, the Debtor's unsecured debt is approximately $3,987,161.43, with the larger claims as follows:

| Creditor | Claim Amount |
|---|---|
| IBM Inc. | $1,382,499 |
| Reed Smith LLP | $654,913.49 |
| QEBI Inc. | $350,000 |
| Michel Botbol | $300,000 |
| Instinctools Ltd. | $222,897 |
| Scale AI, Inc. | $197,727 |
| Olivo IP Law Group Inc. | $166,774 |
| Gartner Inc. | $154,578.88 |
| U.S. Small Business Administration | $146,426.06 |
| Brad Rotter | $84,057 |
| FactSet Research Systems, LLC | $60,300 |
| Skansense | $50,000 |
| iTransition, Inc. | $45,409 |
| Andersen Tax LLC | $30,000 |
| Eisner Advisory Group, LLC | $26,390 |
| RoyaltyStat LLC | $22,500 |
| International Patent Reviews LLC (Russell Smith) | $14,000 |
| Fairview Research, LLC | $11,694 |
| DLA Piper | $11,240 |
| Crunchbase, Inc. | $10,000 |

**E. Circumstances Leading to Chapter 11 Filing.**

16. The Debtor is holding a large amount of unsecured debt, a large portion of which is held by IBM, further to work purportedly performed by its blockchain development and cloud computing groups. This amount was disputed by Debtor without full resolution with IBM, resulting in the debt not being paid by IPwe when expected. IBM has served a demand letter, has not filed a lawsuits, and has neglected to respond to Debtor's multiple communications regarding its request to negotiate a settlement as part recapitalization process. This amount, combined with other debt service amounts totaling approximately $3,305,215 that IPwe is carrying, is causing significant strain on the company and affecting its ability to operate effectively.

**First Day Motions**

17. The Debtor filed the First Day Motions contemporaneously herewith to ensure that the Debtor's business continues to function during the case. For the reasons set forth below, the relief requested in the First Day Motions is necessary to (i) stabilize the Debtor's business operations, (ii) operate with minimal disruption during the pendency of the case, (iii) maintain value as a going concern, and (iv) facilitate the efficient and economical administration of the case. A description of the relief requested and the facts supporting each of the First Day Motions is set forth below.[3]

**A. DIP Motion**

18. Pursuant to the DIP Motion, the Debtor requests entry of interim and final orders authorizing the Debtor to (a) enter into a senior secured super-priority credit facility in the aggregate amount not to exceed $500,000 substantially on the terms set forth in Agreement between the Debtor and Granicus IP, LLC; (b) modify the automatic stay to the extent applicable; and (c) obtain grant of the related relief sought.

---

[3] Capitalized terms used but not otherwise defined in this Section shall have the meanings ascribed to them in the applicable First Day Motion.

19. The Debtor proposes to enter into the DIP financing in order to fund the administration of its Bankruptcy Case, and its reorganization, solely in accordance with the DIP Budget. The DIP Financing will provide the Debtor with approximately $500,000 to fund necessary operations of the Debtor and to administer this Bankruptcy Case through a successful subchapter V reorganization of the Debtor's assets. Without such funding, the Debtor would have to cease operations and lose substantial value to the detriment of all creditors.

20. I believe that the relief requested in the DIP Motion is in the best interests of the Debtor's estate, creditors, and all other parties in interest, and will enable the Debtor to continue to manage its business operations in chapter 11, subchapter V without disruption. Accordingly, I respectfully submit that the DIP Motion should be approved.

**B. Wage Motion**

21. The Debtor requests entry of an interim and final order, authorizing but not directing the Debtor, in its discretion, as deemed necessary to continue to operate and preserve value, to (i) pay all prepetition wages, salaries, and compensation and related administrative and incidental costs and prepetition employee benefits; (ii) pay all employment, unemployment, consulting fees, Social Security, and federal, state, and local taxes relating to the employee compensation and benefit obligations, whether withheld from wages or paid directly by the Debtor to governmental authorities, and make other payroll deductions, including but not limited to retirement and other employee benefit plan contributions, expense reimbursement and voluntary deductions; and (iii) honor and continue the Debtor's prepetition programs, policies, and practices as described in the Wage Motion with respect to the Prepetition Employee Obligations (as defined in the Wage Motion) in the ordinary course of business.

**The Debtor's Employees and Consultants**

22. The Debtor's employees include four (4) individuals who are salaried and three (3) regularly-billing consultants.

**Wage and Salary Obligations**

23. Before the Petition Date and in the ordinary course of business, the Debtor typically paid Employee Compensation Obligations bi-monthly on the 15th and the last day of the month. The Debtor's payroll processor, ADP, receives funds via ACH directly from the Debtor's operating account two to three days before pay day. Employees receive pay via direct deposit.

24. The Debtor estimates that, as of the Petition Date, it has approximately $104,944 outstanding in total accrued prepetition Employee Compensation Obligations, all of which will become due and owing before the final hearing on this motion. No employees will be paid prepetition wages greater than the $15,150 cap established by section 507(a)(4) of the Bankruptcy Code.

**Payroll Taxes**

25. The Debtor withholds funds from employees' wages and salaries and also makes certain payments from its own funds on account of Payroll Taxes. As of the Petition Date, the Debtor estimates that it owes approximately $2,677.50 in Payroll Taxes, including amounts owed by the Debtor and amounts withheld from employees and not yet remitted, all of which will become due and owing before the final hearing on this motion.

**Commissions**

26. Before the Petition Date, the Debtor employed no salespeople and therefore owes no commissions based on sales.

**Leave Policies**

27. Before the Petition Date, the Debtor offered its employees other forms of compensation, including vacation days, holidays, civic duties leave, and bereavement days. These forms of compensation are, in certain cases, required by statute, and in all cases, usual, customary,

9

and necessary if the Debtor is to retain qualified employees to operate its business. Failure to provide these benefits could contravene applicable law and harm employee morale and encourage the premature departure of employees. The Debtor therefore requests authority to continue these programs in the ordinary course of business during this chapter 11, subchapter V case.

### Vacation Days

28. Prior to the Petition Date, the Debtor offered its employees paid time off ("PTO") vacation leave, typically comprising 14 days for the first 3 years of employment; 18 days between 3- and 5-years employment; and 22 days thereafter.[4] Debtor's typical PTO policy states accrued, but unused, PTO is not payable upon separation or termination from IPwe Inc., unless state law dictates otherwise and a maximum of 3 days unused PTO time may be carried over into the next calendar year, unless state law dictates otherwise.

### Bereavement Leave and Civic Duties

29. With some exceptions, employees are entitled to take paid bereavement leave in the event of the death of an immediate family member. In addition, employees who are obligated to perform certain civic duties, including jury duty, are granted leave to fulfill such obligations.

### Holiday Pay

30. The Debtor typically provides PTO for the following holidays: New Year's Day, Good Friday, Memorial Day, Independence Day, Labor Day, Thanksgiving, and Christmas.

### Expense Reimbursements

31. In the ordinary course of its business, the Debtor reimburses employees for expenses incurred on behalf of the Debtor's business. As of the Petition Date, the Debtor does not have any

---

[4] Actual amounts may vary for certain employees that negotiated different terms in an employment agreement executed with the company.

expenses reimbursement obligations due and outstanding, and represents that any amount would be nominal.

**Health and Welfare Benefits**

32. Prior to the Petition Date, the Debtor offered its Employees various health and welfare benefits. For medical, dental, vision, life, disability, and flexible spending, Employees are eligible to enroll on the first of the month following the first month of employment (*i.e.*, if start date is February 2nd, benefit eligibility is March 1st).

**Medical Plan**

33. The Debtor maintains an employee health insurance plan with Blue Cross Blue Shield Texas (the "Employee Health Insurance Plan"). Three employees of the Debtor participate in the Employee Health Insurance Plan.

34. A premium of $22,265.65 is currently due and owing under the Employee Health Insurance Plan. The Debtor contributes approximately 75% and the employee contributes 25% towards the Employee Health Insurance Plan premium. Employee premiums are deducted pre-tax.

35. The Debtor estimates that before the final hearing on the Wage Motion, Prepetition Employee Obligations totaling approximately $104,944 will be due and payable. To fulfill these imminent commitments, the Debtor requests entry of the Interim Order, authorizing the Debtor to pay Prepetition Employee Obligations in an aggregate amount not to exceed the Interim Amount (as defined in the Wage Motion), subject to the $15,150 per-employee cap established by sections 507(a)(4) and (a)(5) of the Bankruptcy Code.

36. Further, the Debtor requests that this Court authorize all applicable banks and other financial institutions to receive, process, honor, and pay all checks, drafts, electronic fund transfers, or other forms of payment drawn or issued on the Debtor's bank accounts before the Petition Date for Prepetition Employee Obligations (or to reissue checks, drafts, electronic fund transfers, or other

forms of payment drawn or issued on the Debtor's bank accounts, as may be necessary), and authorize the banks and financial institutions to rely on the Debtor's representations as to which checks, drafts, electronic fund transfers, or other forms of payment drawn or issued on the Debtor's bank accounts are subject to this motion; *provided that* sufficient funds are on deposit in the applicable bank accounts to cover such payments.

37. I believe that the relief requested in the Wage Motion is in the best interests of the Debtor's estate, its creditors, and all other parties in interest, and will enable the Debtor to continue to manage its business in chapter 11, subchapter V without disruption. Accordingly, I respectfully submit that the Wage Motion should be approved.

**C. Cash Management Motion**

38. As of the Petition Date, the Debtor maintained two accounts with Wells Fargo Bank, N.A. ("Wells Fargo") account number XXX-XXX9490 and account number XXX-XXX8865 (the "Bank Accounts").

39. The Debtor seeks authority to continue using the existing Bank Accounts described above, subject to the Debtor's right to close the Bank Accounts in its discretion and in accordance with any approved post-petition financing.

40. The United States Trustee for the District of Delaware has set forth certain operating and reporting requirements for chapter 11 Case (the "U.S. Trustee Guidelines") that require Debtor in possession to, among other things: (a) establish one debtor in possession bank account for all estate monies required for the payment of taxes, including payroll taxes; (b) close all existing bank accounts and open new debtor in possession accounts; (c) maintain a separate debtor in possession account for cash collateral; and (d) obtain checks that bear the designation "debtor in possession" and reference the bankruptcy case number and type of account on such checks. These requirements are designed to provide a clear line of demarcation between prepetition and post-petition claims and payments, and

to help protect against the inadvertent payment of prepetition claims by preventing banks from honoring checks drawn before the Petition Date.

41. Enforcement of the U.S. Trustee Guidelines during this Case would severely disrupt the Debtor's ordinary financial operations. Accordingly, the Debtor respectfully requests that the Court allow the Debtor to operate the Bank Accounts as such was maintained in the ordinary course of business before the Petition Date.

42. In addition, the Debtor concurrently filed certain motions seeking authorization to pay prepetition obligations in the ordinary course of business. If the Debtor were required to open a new account, the Debtor would likely be unable to timely implement the critical relief sought in those motions. The Debtor has the ability to monitor disbursements from the Bank Accounts to ensure that only those prepetition obligations expressly approved by this Court are paid.

43. In the ordinary course of business, the Debtor uses certain pre-printed check stock. To avoid disruption of its business and unnecessary expense, pursuant to Local Rule 2015-2(a), the Debtor requests that it be authorized to continue to use existing check stock, without reference to its status as debtor in possession. The Debtor submits that parties in interest will not be prejudiced if the Debtor is authorized to continue to use the existing checks. The Debtor will send a notice of commencement of this Case to all creditors. Most parties doing business with the Debtor undoubtedly will be aware of its status as debtor in possession; thus, changing checks immediately is unnecessary and unduly burdensome.

44. The Debtor requests that the Court grant further relief from the U.S. Trustee Guidelines to the extent they require the Debtor to make all disbursements by check. In particular, the U.S. Trustee Guidelines require that all receipts and all disbursements of estate funds must be made by check with a notation representing the reason for the disbursement. In the ordinary course of business, the Debtor conducts transactions through ACH payments and other similar methods. If the

Debtor's ability to conduct transactions by debit, wire, ACH payment, or other similar methods is impaired, the Debtor may be unable to perform under certain contracts, its business operations may be unnecessarily disrupted, and its estate will incur additional costs.  As such, the Debtor should be permitted to continue using debit, wire, and ACH payments.

45. The Debtor requests that the Court authorize the Bank to continue to maintain, service, and administer the Bank Accounts as accounts of the Debtor as debtor in possession, without interruption and in the ordinary course of business.  In this regard, the Bank should be authorized and directed to receive, process, honor, and pay any and all checks, ACH payments and other instructions, and drafts payable through, drawn, or directed on the Bank Accounts after the Petition Date by holders, makers, or other parties entitled to issue instructions with respect thereto.

**D. Tax Motion**

46. The Debtor requests that the Court authorize (a) the Debtor to pay certain prepetition taxes, including, sales and use taxes, property taxes, franchise taxes, and similar taxes and fees in the ordinary course of business, as the Debtor, in its sole discretion, deems necessary, and (b) authorize the banks and financial institutions at which the Debtor's bank accounts are maintained (the "Banks") to honor and process check and electronic transfer requests related to the foregoing.

47. In the ordinary course of business, the Debtor incurs or collects and remits certain taxes including sales, use, personal property, franchise, commercial activity, business and occupation, and various other taxes, fees, charges, and assessments (the "Taxes and Fees").  The Debtor remits such Taxes and Fees to various federal, state, and local taxing and other governmental authorities and/or certain municipal or governmental subdivisions or agencies of those states (the "Taxing Authorities") in connection with the operation of its business and the sale of products.  The Taxes and Fees are paid monthly, quarterly, semi-annually, or annually to the respective Taxing Authorities, depending on the given Tax or Fee and the relevant Taxing Authority to which it is paid.  As of the

Petition Date, the Debtor does not owe any amount in unremitted Taxes and Fees but will likely owe an amount during the pendency of this Case, a portion of which will be attributed to prepetition Taxes and Fees.

48. The Debtor seeks authority to pay all prepetition Taxes and Fees in the ordinary course of business owed to the Taxing Authorities.

49. Any regulatory dispute or delinquency that impacts the Debtor's ability to conduct business in a particular jurisdiction could have a wide-ranging and adverse effect on the Debtor's operations as a whole and on the value of its estate. Specifically, the Debtor's failure to remit the Taxes and Fees could adversely affect the Debtor's business operations because, among other things (a) the Taxing Authorities could initiate audits of the Debtor or seek to prevent the Debtor from continuing its business and administering its estate, which, even if unsuccessful, would unnecessarily divert the Debtor's attention from the process of maximizing the value of the estate; (b) the Taxing Authorities could attempt to suspend the Debtor's operations, file liens, seek to lift the automatic stay and pursue other remedies that will harm the estate; (c) some of the Taxing Authorities may seek to collect penalties, cancel licenses, or undertake other unfavorable enforcement actions if the Debtor does not pay the Taxes and Fees; and (d) certain of the Debtor's directors, officers, and employees might be subject to personal liability, even if such a failure to remit such Taxes and Fees was not a result of malfeasance on their part, which would undoubtedly distract these key people from their duties related to the Case.

50. Further, the Debtor's payment of the Taxes and Fees is an exercise of sound business judgment and is necessary to maximize the value of the Debtor's estate for the benefit of creditors. The Debtor operates a substantial multi-state business, and any disputes that could adversely affect its ability to conduct business in a particular jurisdiction could have wide-ranging and negative effects on the Debtor's operations as a whole and its efforts to efficiently administer the estate and maximize

distributions to its creditors. If the Debtor does not continue paying the Taxes and Fees when they come due on a timely basis, it is possible that Taxing Authorities, or those parties who ordinarily collect the Taxes and Fees, may interfere with the Debtor's business and the efficient administration of the estate.

51.    For the foregoing reasons, it is in the best interests of the Debtor, its estates, its creditors, and all other parties in interest that the Court grant the relief requested in the Tax Motion.

### E.  Insurance Motion

52.    The Debtor maintains various insurance programs providing coverage for, among other things, cyber security and directors and officers (collectively, the "Insurance Programs"). The Insurance Programs include coverage primarily from the insurance policies listed on Exhibit A hereto (the "Insurance Policies"), which the Debtor has obtained through third-party insurance carriers (the "Insurance Carriers").

53.    The Debtor seeks entry of an order authorizing, but not directing, the Debtor to (a) continue and, to the extent necessary, revise, extend, renew, supplement, or change its prepetition Insurance Policies, or enter into new policies, if necessary, in the ordinary course of business and (b) pay all prepetition obligations in respect thereof, including brokerage and administrative fees (collectively, the "Insurance Obligations") in the ordinary course of business and pay prepetition obligations in respect thereof.

54.    In connection with its business operations, the Debtor maintains multiple Insurance Policies that vary in amounts and types of coverage in accordance with prudent business practices, state and local laws governing the jurisdictions in which the Debtor operates and various contractual obligations. The Insurance Policies include (a) cyber security; and (b) directors and officer's insurance.

55. For these reasons, it is in the best interests of the Debtor, its estates, its creditors, and all other interested parties that the Court grant the relief requested in the Insurance Motion.

I declare under penalty of perjury that, to the best of my knowledge after reasonable inquiry, the foregoing is true and correct.

Dated: January 24, 2024

Leann Pinto, Chief Executive Officer