**<u>Exhibit 1 to Sale Order</u>**

**Asset Purchase Agreement**

# ASSET PURCHASE AGREEMENT

**dated as of**

**July 16, 2024**

**by and between**

**George L. Miller, as Chapter 7 Trustee of
IPwe, Inc.**

**and**

**Urbana Partners, LLC**

Docusign Envelope ID: 2645ABA9-0F2F-402F-A5C6-FAA3D7CEEA0E

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT ("**Agreement**") is entered into as of July 16, 2024, by and between Urbana Partners, LLC, a Delaware limited liability company having a place of business at c/o Morris Legal Corp., 1441 Broadway, 3rd Floor, New York, New York 10018, (the "**Purchaser**"), and George L. Miller, in his capacity as chapter 7 trustee of IPwe, Inc. ("**Seller**" or "**Trustee**"), in the chapter 7 case no. 24-10078 (CTG) (the "**Bankruptcy Case**"), pending in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**").

## RECITALS

WHEREAS, Debtor is a financial technology company focused on developing products that change how people engage with, manage, transact and value intellectual property assets, using artificial intelligence, machine learning, and blockchain;

WHEREAS, on January 24, 2024 (the "**Petition Date**"), IPwe, Inc. (the "**Debtor**") filed a voluntary petition for relief under Chapter 11, Subchapter V of title 11 of the United States Code (the "**Bankruptcy Code**");

WHEREAS, on March 13, 2024 (the "**Conversion Date**"), the Court entered an order converting the Debtor's case to a case under Chapter 7 of the Bankruptcy Code;

WHEREAS, on the Conversion Date, George L. Miller was appointed as the chapter 7 trustee for the Debtor's estate;

WHEREAS, the transactions contemplated by this Agreement will be consummated pursuant to a Sale Approval Order (as defined below) to be entered in the Bankruptcy Case under Sections 105, 363, 365 and other applicable provisions of the Bankruptcy Code, and this Agreement and the transactions contemplated herein are subject to the approval of the Bankruptcy Court; and

WHEREAS, Seller wishes to sell and assign to Purchaser and Purchaser wishes to acquire and assume from Seller the Purchased Assets, as that term is defined below, and as set forth in this Agreement.

NOW, THEREFORE, in consideration of the mutual promises in this Agreement and for other good and valuable consideration, the parties hereby agree as follows.

## AGREEMENT

1. **DEFINITIONS**

    **1.1** "**Affiliate**" of a Person means any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with such Person.

**1.2** "**Agreement**" means this Asset Purchase Agreement among the parties set forth on the first page hereof, including, without limitation, all Exhibits and Schedules hereto, as the same may be amended from time to time.

**1.3** "**Alternative Transaction**" means the sale, transfer or other disposition, directly or indirectly, including through an asset sale, share sale, merger, amalgamation, or other similar transaction, including a plan of reorganization approved by the Bankruptcy Court, or resulting from the Auction, of the Purchased Assets, in a transaction or series of transactions with one or more Persons other than Purchaser.

**1.4** "**Ancillary Agreements**" means any agreement, instrument or other document to be executed and delivered in connection with the consummation of the transactions contemplated by this Agreement and shall include, without limitation, any agreement, instrument, or other document that is set forth in **Section 2.6** hereof.

**1.5** "**Apportioned Obligations**" has the meaning set forth in **Section 5.5** hereof.

**1.6** "**Assumed Contract(s)**" has the meaning set forth in **Section 2.1(a)** hereof.

**1.7** "**Assumed Liabilities**" has the meaning set forth in **Section 2.3(a)** hereof.

**1.8** "**Auction**" means the auction of the Purchased Assets.

**1.9** "**Bankruptcy Case**" has the meaning given to it in the recitals hereto.

**1.10** "**Bankruptcy Code**" has the meaning given to it in the recitals hereto.

**1.11** "**Bankruptcy Court**" has the meaning given to it in the recitals hereto.

**1.12** "**Bidding Procedures**" means the auction, sale and bidding procedures approved by the Bid Procedures Order.

**1.13** "**Bid Procedures Order**" means the order approving the bidding procedures at the Auction for the Purchased Assets.

**1.14** "**Business Day**" means any day other than a Saturday, Sunday, or other day on which commercial banks in Delaware are required or authorized by law to be closed.

**1.15** "**Cash and Cash Equivalents**" means all cash and cash equivalents, including checks, commercial paper, treasury bills, certificates of deposit and other bank deposits, securities, securities entitlements, instruments and other investments of Debtor, and all bank accounts and securities accounts, including any cash collateral that is collateralizing any letters of credit.

**1.16** "**Cash Payment**" has the meaning set forth in **Section 2.5(a)** hereof.

**1.17** "**Closing**" means the closing of the transactions contemplated by this Agreement.

**1.18**    "**Closing Date**" means the date on which the conditions set forth in Article VI are satisfied or waived, or such other date as the parties may mutually agree, upon which the Closing takes place.

**1.19**    "**Code**" means the Internal Revenue Code of 1986, as amended.

**1.20**    "**Consent**" means any consent, approval, authorization, license or order of, registration, declaration or filing with, or notice to, or waiver from, any federal, state, local, foreign or other Governmental Entity or any Person, including, without limitation, any security holder or creditor which is necessary to be obtained, made or given in connection with the execution and delivery of this Agreement and/or any Ancillary Agreement, the performance by a Person of its obligations hereunder and/or thereunder and the consummation of the transactions contemplated hereby and/or thereby.

**1.21**    "**Cure Claims**" means amounts that must be paid and obligations that otherwise must be satisfied, pursuant to Sections 365(b)(1)(A) and (B) of the Bankruptcy Code, in connection with the assumption, assignment, and/or sale of the Assumed Contracts, as determined pursuant to the process set forth in the Bid Procedures Order.

**1.22**    "**Cure Cost Escrow**" has the meaning set forth in **Section 5.4(a)** hereof.

**1.23**    "**Deposit**" has the meaning set forth in **Section 2.5** hereof.

**1.24**    "**Encumbrances**" means collectively and without limitation, any and all mortgages, security interests, conditional sales or title retention agreements, pledges, hypothecations, rights, liens, judgments, rights of first refusal, interests, encumbrances or claims of any kind or nature whatsoever, including, without limitation, any and all "claims" as defined in Section 101(5) of the Bankruptcy Code, whether arising by agreement, any statute or otherwise and whether arising before, on or after the Filing Date.

**1.25**    "**Excluded Assets**" has the meaning set forth in **Section 2.2** hereof.

**1.26**    "**Excluded Liabilities**" has the meaning set forth in **Section 2.3(b)** hereof.

**1.27**    "**Filing Date**" has the meaning given to it in the recitals hereto.

**1.28**    "**Final Order**" means an order, judgment or other decree, the operation or effect of which has not been reversed, stayed, modified, or amended and any and all appeal periods with respect to such order, judgment or other decree have expired.

**1.29**    "**GAAP**" means United States generally accepted accounting principles, applied on a consistent basis.

**1.30**    "**Governmental Entity**" means any federal, state, local or foreign government, political subdivision, legislature, court, agency, department, bureau, commission or other governmental regulatory authority, body, or instrumentality, including any industry or other non-governmental self-regulatory organizations.

**1.31** "**Insurance Policies**" shall have the meaning set forth in Section 3.10 of this Agreement.

**1.32** "**Intellectual Property**" means all Debtor's intellectual property of any kind used, or held for use, in connection with the operation of its business, including the following: (i) trademarks, service marks, trade names, slogans, logos, trade dress, internet domain names, brand names, and other similar designations of source or origin, together with all goodwill, registrations and applications related to the foregoing; (ii) patents, utility models and industrial design registrations (and all continuations, divisionals, continuations in part, provisionals, renewals, reissues, re-examinations and applications for any of the foregoing); (iii) copyrights and copyrightable subject matter (including, without limitation, any registrations and applications for any of the foregoing); (iv) trade secrets, proprietary processes, formulae, algorithms, models, and methodologies; and (v) computer software, computer programs, and databases (whether in source code, object code or other form).

**1.33** "**Intellectual Property Rights**" means all proprietary rights and privileges of any kind or nature, however known or denominated, whether arising by operation of law, contractual obligation, or other means, throughout the world, including the right to distribute, exhibit, broadcast, and market by all means now known or hereafter devised (including over the Internet, World Wide Web, or other computer network) Intellectual Property.

**1.34** "**Knowledge of Seller**" or any other similar knowledge qualification in this Agreement means all facts actually known by the George L. Miller, in his capacity as chapter 7 trustee of the Debtor.

**1.35** "**Material Adverse Effect**" means a state of facts, event, change or effect to the Business, that results in a material adverse effect on the Debtor's business, taken as a whole, but excludes any state of facts, event, change or effect caused by states of facts, events, changes or developments relating to: (i) changes or conditions affecting the industry in general; (ii) changes in economic, regulatory or political conditions generally; (iii) any act(s) of war or of terrorism; (iv) the initiation of the Bankruptcy Case; (v) any actions taken in the Bankruptcy Case in furtherance of the transactions contemplated herein; or (vi) changes resulting from any motion, application, proceeding or order relating to, filed or entered in the Bankruptcy Case.

**1.36** "**Next Highest Bidder**" has the meaning set forth in the Bidding Procedures.

**1.37** "**Permits**" means all licenses, certificates of authority, permits, orders, consents, franchises, approvals, registrations, clearances, variances, exemptions, local siting approvals, authorizations, qualifications, and filings under any laws or with any Governmental Entities or other private Persons.

**1.38** "**Person**" means an individual, corporation, partnership, limited liability company, firm, joint venture, association, joint stock company, trust, unincorporated organization or other entity, or any Governmental Entity or quasi-governmental body or regulatory authority.

**1.39** "**Post-Closing Tax Period**" shall mean (i) any Tax period beginning any time after the Closing Date and (ii) with respect to a Tax period that commences before but ends after the Closing Date, the portion of such period beginning the day after the Closing Date.

**1.40**    "**Pre-Closing Tax Period**" shall mean (i) any Tax period ending on or before the Closing Date and (ii) with respect to a Tax period that commences before but ends after the Closing Date, the portion of such period up to and including the Closing Date.

**1.41**    "**Purchased Assets**" has the meaning set forth in **Section 2.1** hereof.

**1.42**    "**Purchase Price**" has the meaning set forth in **Section 2.5** hereof.

**1.43**    "**Purchaser**" has the meaning given to it in the recitals hereto.

**1.44**    "**Sale Approval Order**" has the meaning set forth in **Section 5.4(c)** hereof.

**1.45**    "**Sale Hearing**" means the hearing to approve the sale of the Purchased Assets.

**1.46**    "**Seller**" has the meaning given to it in the recitals hereto.

**1.47**    "**Subsidiary**" means, with respect to any Person, any other Person (i) of which the first Person owns directly or indirectly fifty percent (50%) or more of the equity interest in the other Person; (ii) of which the first Person or any other Subsidiary of the first Person is a general partner or (iii) of which securities or other ownership interests having ordinary voting power to elect a majority of the board of directors or other persons performing similar functions with respect to the other Person are at the time owned by the first Person and/or one or more of the first Person's Subsidiaries.

**1.48**    "**Successful Bidder**" shall have the meaning set forth in the Bidding Procedures.

**1.49**    "**Tangible Personal Property**" has the meaning set forth in **Section 2.1(c)** hereof.

**1.50**    "**Taxes**" (or "**Tax**" where the context requires) shall mean all federal, state, county, provincial, local, foreign and other taxes (including, without limitation, income, profits, premium, estimated, excise, sales, use, occupancy, gross receipts, franchise, ad valorem, severance, capital levy, production, transfer, withholding, employment and payroll related and property taxes and other governmental charges and assessments), whether attributable to statutory or nonstatutory rules and whether or not measured in whole or in part by net income, and including, without limitation, interest, additions to tax or interest, charges and penalties with respect thereto, and expenses associated with contesting any proposed adjustment related to any of the foregoing.

## 2.    PURCHASE AND SALE OF ASSETS

**2.1**    <u>Purchase and Sale of Assets.</u>  Subject to the terms and conditions of this Agreement together with any Bankruptcy Court approval that may be required, including the payment by Purchaser of the Purchase Price, at the Closing, Seller hereby agrees to sell, assign, transfer, convey and deliver to Purchaser, and Seller hereby sells, assigns, transfers, conveys and delivers to Purchaser, free and clear of any and all Encumbrances, good, valid and marketable title and interest in and to all of the assets, properties and rights of the Debtor described in Schedule 1 hereto, except for the Excluded Assets as defined in Section 2.2 below, to the maximum extent permitted by Section 363 of the Bankruptcy Code (such assets, properties and rights are hereinafter collectively referred to as the "**Purchased Assets**"), on an "As Is/Where Is" basis.

**2.2**     Excluded Assets.  Notwithstanding anything to the contrary herein, Seller shall not cause to be sold, assigned, transferred, conveyed or delivered, to Purchaser, and Purchaser shall not purchase, and the Purchased Assets shall not include, any right, title or interest of Seller in any of the following assets (the "**Excluded Assets**"):

(a)     All rights of Seller under this Agreement and the Ancillary Agreements;

(b)     All Debtor's Cash and Cash Equivalents;

(c)     All corporate records, including without limitation, the organizational documents of the Debtor, accounting documents, tax returns, audit materials, legal records, board and member minutes and related correspondence, stock transfer books, blank stock certificates and other related documents; provided, however, that Purchaser shall be granted reasonable access to, and the right to make copies of, any such documents;

(d)     All human resources material including without limitation employment and compensation records and benefits information;

(e)     All executory contracts and unexpired leases that are not the Assumed Contract(s);

(f)     All bankruptcy avoidance claims of the Debtor, including, without limitation, any claims arising under Sections 544, 545, 547, 548 549, 550 and 551 of the Bankruptcy Code and any applicable state law; and

(g)     All Debtor's known or unknown claims, causes of action, choses in action, rights of recovery, and rights of set-off of whatever kind or description against any Person arising out of pre-Closing Date transactions.

**2.3**     Assumed and Excluded Liabilities.

(a)     Upon the terms and subject to the conditions of this Agreement, on the Closing Date, Purchaser shall assume and agree to perform and discharge, when due (in accordance with their respective terms and subject to the respective conditions thereof) only the following obligations, claims and liabilities of the Debtor and no others (collectively, the "**Assumed Liabilities**"): liabilities arising from the ownership of the Purchased Assets on and after the Closing Date.

(b)     Seller shall retain, and shall be responsible for paying or performing when due, or discharging, and shall pay or perform when due, or discharge, and the Purchaser shall not assume or have any responsibility for, all liabilities of the Debtor or its Affiliates not expressly assumed by Purchaser pursuant to **Section 2.3(a)** of this Agreement (the "**Excluded Liabilities**"). The term Excluded Liabilities shall specifically include, without limitation:

(i)     Taxes accruing during the Pre-Closing Tax Period;

(ii)     Any and all liabilities accruing and/or arising out of or relating to the Excluded Assets;

6

(iii)    any and all liabilities of Debtor under this Agreement and all legal, accounting, brokerage, investment banking and finder's fees or other fees and expenses incurred by or on behalf of Seller in connection with this Agreement and the transactions contemplated hereby;

(iv)    any and all liabilities and obligations to current and former employees or contractors of Debtor, or arising under or in connection with any Seller plans, and including commissions payable, deferred compensation, past due wages, or interest payable;

(v)    any and all liabilities and obligations arising out of or relating to any line-of-credit or other payable or debt facility or instrument;

(vi)    any and all pre-petition trade payables or other accounts payable of the Debtor; and

(vii)    all liabilities related to, associated with or arising out of any action, claim, suit or proceeding with respect to the operation of the Business prior to the Closing, whether such action, claim, suit or proceeding is brought prior to, on or after the Closing.

2.4    Closing.  Subject to the terms and conditions of this Agreement, the Closing shall take place at a virtual closing three to five business days after the Sale Hearing, or at such other place and time as the parties agree orally or in writing.

2.5    Consideration.  The aggregate consideration to be paid by Purchaser for the Purchased Assets (the "**Purchase Price**") shall be the following:

(a)    a cash amount equal to $150,000.00, payable by Purchaser to Seller at Closing by wire transfer or immediately available funds (the "**Cash Payment**"); and

(b)    assumption of the Assumed Liabilities.

The parties agree to allocate the Purchase Price among the Purchased Assets for all purposes, including financial, accounting and tax purposes, as set forth on **Schedule 2.5**.  Without changing the Purchase Price, the Purchaser has the option to leave assets in the Debtor's estate.

As of the date hereof, Seller shall have received a deposit from Purchaser in the amount of $15,000.000 (the "**Deposit**").  In the event of a termination of this Agreement by Seller pursuant to **Section 7.1(b)(i)**, the Deposit shall be disbursed to Seller as provided in **Section 7.2(b)(iii)**.  In the event that the Purchaser is not (a) the Successful Bidder at the Auction or (b) the Next Highest Bidder, Seller shall return the Deposit to Purchaser in accordance with the bid procedures approved by the Bid Procedures Order.  In the event of termination of this Agreement (other than as a result of a breach of this Agreement by Purchaser) pursuant to Section 6.1 (h), the Deposit shall be returned as set forth therein.

2.6    Delivery.  Subject to entry of the Sale Approval Order, at the Closing:

(a)    Purchaser shall deliver the Cash Payment to Seller;

     **(b)**     Seller shall deliver to Purchaser the Purchased Assets;

     **(c)**     Seller shall deliver to Purchaser an executed Bill of Sale in the form attached as **Exhibit A** hereto;

     **(d)**     Seller and Purchaser shall execute and deliver the Assignment and Assumption Agreement in the form attached as **Exhibit B** hereto;

     **(e)**     Seller shall deliver to Purchaser all necessary consents to assignment related to the Assumed Contract(s);

     **(f)**     Seller shall deliver to Purchaser such other and further documents as Purchaser shall reasonably request to demonstrate the purchase and sale of the Purchased Assets by the Purchaser as contemplated herein and to vest in Purchaser all right, title and interest in, to and under the Purchased Assets;

     **(g)**     Seller shall deliver a true and correct copy of the Sale Approval Order; and

     **(h)**     Seller shall deliver a copy of the Bankruptcy Court's docket sheet for the Bankruptcy Case evidencing that the Sale Approval Order is a Final Order.

     **2.7**     <u>Possession</u>. Subject to entry of the Sale Approval Order, right to possession of the Purchased Assets shall transfer to Purchaser on the Closing Date. Seller shall transfer and deliver to Purchaser on the Closing Date such keys, lock and safe combinations and other similar items as Purchaser shall require to obtain immediate and full occupation and control of the Purchased Assets, and shall also make available to Purchaser at Seller's then existing locations all documents in Seller's possession that are required to be transferred to Purchaser by this Agreement.

     **2.8**     <u>Transfer Taxes</u>. Any sales, use, purchase, transfer, franchise, deed, fixed asset, stamp, documentary stamp, use or other Taxes and recording charges that may be payable by reason of the sale of the Purchased Assets or the assumption of the Assumed Liabilities under this Agreement or the transactions contemplated herein (collectively, "**Transfer Taxes**") shall be borne and paid by Purchaser.

     **2.9**     <u>"As Is/Where Is" Transaction</u>. Purchaser acknowledges and agrees that it has conducted its own independent investigation, review and analysis of the Purchased Assets and the Assumed Liabilities and acknowledges that it has been provided adequate access to the personnel, properties, assets, premises, books and records, and other documents and data of the Seller for such purpose. Purchaser acknowledges and agrees that: (a) in making its decision to enter into this Agreement and to consummate the transactions contemplated hereby, Purchaser has relied solely upon its own investigation and the express representations and warranties of the Seller set forth in Article 3 of this Agreement; and (b) neither Seller, nor any other Person, has made any representation or warranty as to Seller, the Business, the Purchased Assets, the Assumed Liabilities or this Agreement, except as expressly set forth in Article 3 of this Agreement (as qualified by the Seller Disclosure Schedules).

     SUCH REPRESENTATIONS AND WARRANTIES MADE BY THE SELLER IN ARTICLE 3 CONSTITUTE THE SOLE AND EXCLUSIVE REPRESENTATIONS AND

WARRANTIES OF THE SELLER TO PURCHASER IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED HEREBY, AND PURCHASER UNDERSTANDS, ACKNOWLEDGES AND AGREES THAT, EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES SET FORTH IN ARTICLE 3 OF THIS AGREEMENT, ALL OTHER REPRESENTATIONS AND WARRANTIES OF ANY KIND OR NATURE EXPRESS OR IMPLIED, WRITTEN OR ORAL (INCLUDING ANY REPRESENTATION OR WARRANTY AS TO THE ACCURACY OR COMPLETENESS OF ANY INFORMATION REGARDING SELLER, ANY AFFILIATES OF SELLER, THE BUSINESS, THE PURCHASED ASSETS OR THE ASSUMED LIABILITIES FURNISHED OR MADE AVAILABLE TO PURCHASER AND ITS REPRESENTATIVES, INCLUDING WITHOUT LIMITATION THE SCOPE OR VALIDITY OF ANY INTELLECTUAL PROPERTY AND ANY INFORMATION, DOCUMENTS OR MATERIAL MADE AVAILABLE TO PURCHASER, MANAGEMENT PRESENTATIONS OR IN ANY OTHER FORM IN EXPECTATION OF THE TRANSACTIONS CONTEMPLATED HEREBY OR AS TO THE FUTURE REVENUE, PROFITABILITY OR SUCCESS OF THE BUSINESS, OR ANY REPRESENTATION OR WARRANTY ARISING FROM STATUTE OR OTHERWISE IN LAW OR RELATING TO MERCHANTABILITY OR FITNESS FOR USE) ARE SPECIFICALLY DISCLAIMED BY THE SELLER. PURCHASER HEREBY ACKNOWLEDGES AND AGREES THAT PURCHASER IS PURCHASING THE PURCHASED ASSETS ON AN "AS IS, WHERE IS", "WHERE IS," AND "WITH ALL FAULTS" BASIS AFTER GIVING EFFECT TO THE TERMS CONTAINED HEREIN.

3. **REPRESENTATIONS AND WARRANTIES OF SELLER**

Seller hereby represents and warrants to Purchaser that, subject to entry of the Sale Approval Order, the statements in this **Section 3** are correct and complete as of the date hereof and shall be correct and complete as of the Closing Date.

**3.1**    Authority.  Debtor is a corporation duly organized and in good standing under the laws of the State of Delaware. Seller has all requisite power and authority to execute and deliver this Agreement and the Ancillary Agreements to which it is or shall, pursuant to this Agreement, be a party, and to perform, carry out and consummate the transactions contemplated hereby and thereby.  The execution, delivery and performance of this Agreement and the Ancillary Agreements to which Seller is or shall, pursuant to this Agreement, be a party have been duly authorized by all necessary action on the part of Seller. This Agreement has been duly executed and delivered by Seller and constitutes the valid and legally binding obligation of Seller, enforceable against Seller in accordance with its terms and conditions.

**3.2**    Title.  Seller, in his capacity as chapter 7 trustee of the Debtor, has good and marketable title to, or a valid interest in, all of the Purchased Assets and, upon the Closing will convey and transfer to Purchaser all of the Purchased Assets, and Purchaser shall receive good and marketable title to, or a valid interest in, all of the Purchased Assets free and clear of any Encumbrances, pursuant to sections 105 and 363 of the Bankruptcy Code and any other applicable sections of the Bankruptcy Code and as set forth in the Sale Approval Order.

**3.3**    Brokers.  Other than the Seller's retention of Auction Advisors LLC ("**Auction Advisors**") pursuant to a prior order of the Bankruptcy Court, Seller has no liability or obligation

9

to pay any broker, finder or investment banker, any brokerage, finder's or other fee or commission in connection with the origination, negotiation or execution of this Agreement and the Ancillary Agreements or the transactions contemplated by this Agreement and the Ancillary Agreements based upon arrangements made by or on behalf of Seller for which Purchaser could become liable or obligated. Seller is responsible for and shall pay any and all amounts due and owing to Auction Advisors arising from the origination, negotiation or execution of this Agreement and the Ancillary Agreements or the /transactions contemplated by this Agreement and the Ancillary Agreements and Purchaser has no obligation to Auction Advisors.

**3.4** <u>Litigation</u>. Other than the Bankruptcy Case, there is no claim, action, suit, proceeding, opposition, challenge, cancellation proceeding or investigation (collectively, "**Actions**") pending or, to the Knowledge of Seller, currently threatened against Debtor or Seller that would prohibit Seller from entering into this Agreement or any Ancillary Agreement, or to consummate the transactions contemplated hereby or thereby, or that, to the Knowledge of Seller, could result, either individually or in the aggregate, in any Material Adverse Effect, nor, to the Knowledge of Seller, is there any basis for the foregoing. There are no outstanding orders, writs, judgments, decrees, injunctions or settlements that restrict the Purchased Assets in any material respect.

**3.5** <u>Tangible Personal Property</u>. Seller has not received notice that any of the Tangible Personal Property is in violation of any existing law or order of any Governmental Authority.

## 4. REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby represents and warrants to Seller as follows:

**4.1** <u>Authority</u>. Purchaser is a limited liability company organized and in good standing under the laws of the State of Delaware. Purchaser has the right and authority to enter into, execute, deliver and perform this Agreement and the Ancillary Agreements and to carry out the obligations hereunder and thereunder, without the need for any further approval of its officers and directors. All action on Purchaser's part required for the lawful execution and delivery of this Agreement has been taken. Upon its execution and delivery by Purchaser, this Agreement will be valid and legally binding obligations of the Purchaser in accordance with its terms.

**4.2** <u>Compliance with Other Instruments</u>. The execution, delivery and performance of this Agreement and the Ancillary Agreements, and the consummation of the transactions contemplated hereby and thereby will not result in any such violation or default or be in conflict with or constitute, with or without the passage of time and giving of notice, either a default under any such provision, instrument, judgment, order, writ, decree or contract or an event that results in the creation of any lien, charge or encumbrance upon any of its material properties or assets.

**4.3** <u>Brokers</u>. No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the origination, negotiation or execution of this Agreement and the Ancillary Agreements or the transactions contemplated by this Agreement and the Ancillary Agreements based upon arrangements made by or on behalf of Purchaser.

**4.4** <u>Litigation</u>. There is no action, suit, proceeding, or investigation pending or, to Purchaser's knowledge, currently threatened in writing against Purchaser that questions the

10

validity of this Agreement or any Ancillary Agreement, or the right of Purchaser to enter into such agreements, or to consummate the transactions contemplated hereby or thereby.

**4.5**    Financial Assurance.  The Purchaser has sufficient cash, available lines of credit or other sources of immediately available funds to enable it to make payment of the Purchase Price and any other amounts to be paid by it hereunder.

**4.6**    Good Faith Purchaser.    This Agreement and all Ancillary Agreements were negotiated and entered into at arm's length and, to the Purchaser's knowledge, in good faith, and Seller and Purchaser did not engage in any collusion with respect to setting or fixing the Purchase Price, and to the knowledge of Purchaser, there are no facts to support a finding that Seller negotiated and entered into this Agreement and all Ancillary Agreements other than in good faith as described in Section 363(m) of the Bankruptcy Code.

## 5.    COVENANTS

**5.1**    Seller Records.    Prior to the Closing Date, Seller shall afford Purchaser, its attorneys, accountants and representatives, free and full access to Debtor's books and records related to the Purchased Assets and shall provide to Purchaser and its representatives such additional financial and operating data and other information relating to the Purchased Assets as Purchaser shall from time-to-time reasonably request.

**5.2**    Filings and Authorizations.    Each of Seller and Purchaser, as promptly as practicable, (i) shall make, or cause to be made, all such filings and submissions under laws, rules and regulations applicable to it, as may be required to consummate the transactions contemplated herein, in accordance with the terms of this Agreement, (ii) shall use all commercially reasonable efforts to obtain, or cause to be obtained, all authorizations, approvals, consents and waivers from all Governmental Entities and non-governmental Persons necessary to be obtained by it, in order to consummate the transactions contemplated herein; provided, however, that, any provision hereof to the contrary notwithstanding, Seller shall have no obligation to pay any fee to any third party (other than any lawful fees assessed by a Governmental Entity) for the purpose of obtaining any Consent or any costs and expenses of any third party resulting from the process of obtaining such Consent, and (iii) shall use commercially reasonable efforts to take, or cause to be taken, all other actions necessary, proper or advisable in order for him, her or it to fulfill his, her or its obligations hereunder.  Seller and Purchaser shall coordinate and cooperate with one another in exchanging such information and supplying such reasonable assistance as may be reasonably requested by each in connection with the foregoing.

**5.3**    Further Assurances; Accounts.

**(a)**    Simultaneously with the Closing, Seller shall take such steps as may be necessary to put Purchaser in possession and operating control of the Purchased Assets. At or after the Closing, Seller shall, at the reasonable request of Purchaser, without further consideration, promptly execute and deliver, or cause to be executed and delivered, to Purchaser such assignments, bills of sale, consents and other instruments in addition to those required by this Agreement, in form and substance reasonably satisfactory to Purchaser, and take all such other actions as Purchaser may reasonably deem necessary or desirable to implement any provision of

11

this Agreement and to more effectively transfer to and vest in Purchaser, ownership in, and to put Purchaser in possession of, all of the Purchased Assets, free and clear of any and all Encumbrances.

**5.4**    <u>Bankruptcy Covenants</u>.

**(a)**    <u>[Reserved]</u> .

**(b)**    <u>Motions, Orders, etc</u>.  Seller shall promptly provide Purchaser with the proposed final drafts of all documents, motions, orders, or pleadings that Seller proposes to file with the Bankruptcy Court relating to the approval of this Agreement, the Purchased Assets, or the consummation of the transactions contemplated hereby, or any provision therein or herein, and shall provide Purchaser and its counsel with a reasonable opportunity to review and comment on such documents, motions, orders, or pleadings.

**(c)**    <u>Sale Approval Order</u>.  Without limiting the generality of the foregoing **Section 5.4(b)**, the sale approval order, in the form annexed hereto as **Exhibit C** (the "**Sale Approval Order**"), shall be reasonably acceptable in form and substance to Purchaser and shall include provisions, among other things (i) providing that Purchaser shall not incur any liability as a successor to the Debtor's business, (ii) approving the sale of the Purchased Assets to Purchaser on the terms and conditions set forth in this Agreement and authorizing Seller to proceed with this transaction, (iii) stating that any objections filed with respect to the sale of the Purchased Assets, which have not been withdrawn, are overruled or the interests of such objections have been otherwise satisfied or adequately provided for by the Bankruptcy Court, (iv) finding that the Purchase Price represents fair value for the Purchased Assets, (v) finding that the sale is in the best interests of Debtor's estate and creditors, (vi) finding that Purchaser is a good faith purchaser of the Purchased Assets under section 363(m) of the Bankruptcy Code and that the provisions of section 363(n) of the Bankruptcy Code have not been violated, (vii) providing that the sale of the Purchased Assets to Purchaser shall be free and clear of all Encumbrances whatsoever under section 363 of the Bankruptcy Code and any other applicable sections of the Bankruptcy Code, (viii) providing that the Bankruptcy Court shall retain jurisdiction, among other things, for the purpose of enforcing the provisions of the Sale Approval Order including, without limitation, compelling delivery of the Purchased Assets to Purchaser and protecting Purchaser against any Encumbrances against Seller or the Purchased Assets, (ix) finding that, other than Auction Advisors, there are no brokers involved in consummating the sale and, other than the fees approved by the Bankruptcy Court in connection with Auction Advisors' retention, no brokers' commissions are due, (x) providing that the parties hereto shall be authorized to close this transaction immediately upon execution of the Sale Approval Order pursuant to Rules 6004(g) and 6006(d) of the Federal Rules of Bankruptcy Procedure, (xi) authorizing and directing Seller to execute, deliver, perform under, consummate and implement this Agreement, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the foregoing and (xii) determining that Purchaser is not a successor to Debtor or otherwise liable for any of the Excluded Liabilities or Excluded Assets and permanently enjoining each and every holder of any of the Excluded Liabilities or Excluded Assets from commencing, continuing or otherwise pursuing or enforcing any remedy, claim, cause of action or Encumbrance against Purchaser or the Purchased Assets related thereto.  Seller shall use its best efforts to obtain the earliest available date for a hearing to approve the Sale Approval Order.  To the extent that there

is any inconsistency between this paragraph and the Sale Approval Order, the Sale Approval Order shall govern.

    **(d)**    <u>Other Bankruptcy Covenants</u>. Seller shall promptly make any filings, take all actions, and use commercially reasonable efforts to obtain any and all other approvals and orders necessary or appropriate for consummation of the sale of the Purchased Assets, subject to its obligations to comply with any order of the Bankruptcy Court. In the event an appeal is taken, or a stay pending appeal is requested, from any of the foregoing orders of the Bankruptcy Court, Seller shall immediately notify Purchaser of such appeal or stay request and, upon Purchaser's request, shall provide to Purchaser within one (1) business day after Seller's receipt thereof a copy of the related notice of appeal or order of stay. Seller shall also provide Purchaser with written notice of any motion, application, brief or other pleading filed in connection with any appeal from any of such orders.

    **(e)**    <u>Competing Transaction</u>. This Agreement is subject to approval by the Bankruptcy Court and the consideration by Seller of higher or better competing bids in respect of all or any part of the Purchased Assets (whether in combination with other assets of Debtor's Affiliates or otherwise) (each a "**Competing Bid**"). Seller is permitted to, and permitted to cause its representatives, agents and Affiliates to, initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, any Person (in addition to Purchaser and its Affiliates, representatives and agents) in connection with any sale or other disposition of the Purchased Assets. In addition, Seller and its representatives, agents and Affiliates shall have the authority to respond to any inquiries or offers to purchase all or any part of the Purchased Assets (whether in combination with assets of Seller's Affiliates or otherwise) and perform any and all other acts related thereto which are required under the Bankruptcy Code or other applicable law, including supplying information relating to the Business and the assets of Seller to prospective purchasers.

    **5.5**    <u>Apportioned Obligations</u>. Except for any Transfer Taxes (as to which Purchaser shall wholly satisfy), all Taxes and similar ad valorem obligations levied with respect to the Purchased Assets for a taxable period which includes (but does not end on) the Closing Date (collectively, the "**Apportioned Obligations**") shall be apportioned between Seller and Purchaser based on the number of days of such taxable period included in the Pre-Closing Tax Period and the number of days of such taxable period included in the Post-Closing Tax Period. Seller shall be liable for the proportionate amount of such Taxes that is attributable to the Pre-Closing Tax Period, and Purchaser shall be liable for the proportionate amount of such Taxes that is attributable to the Post-Closing Tax Period. Upon receipt of any bill for Taxes relating to the Purchased Assets, each of Seller and Purchaser shall present a statement to the other setting forth the amount of reimbursement to which each is entitled under this **Section 5.5** together with such supporting evidence as is reasonably necessary to calculate the proration amount. The proration amount shall be paid by the party owing it to the other within ten (10) Business Days after delivery of such statement. In the event that either Seller or Purchaser shall make any payment for which it is entitled to reimbursement under this **Section 5.5**, the other party shall make such reimbursement promptly but in no event later than ten (10) Business Days after the presentation of a statement setting forth the amount of reimbursement to which presenting party is entitled along with such supporting evidence as is reasonably necessary to calculate the amount of reimbursement. Purchaser shall notify Seller of any audit or examination of the Apportioned Obligations. The Seller shall have the right to participate in any such audit or examination and Purchaser shall not

13

settle any such audit or examination without the consent of Seller, which consent shall not be unreasonably withheld.

**5.6**   Notification.  From time to time prior to the Closing, Seller shall notify Purchaser in writing with respect to any matter hereafter arising or any information obtained after the date hereof that, if existing, occurring or known at or prior to the date of this Agreement, would have been required to be set forth or described in the Disclosure Schedule or that is necessary to complete or correct any information in such schedule or in any representation and warranty of Seller that has been rendered inaccurate thereby.  Seller shall promptly inform Purchaser of any claim by a third party that a contract has been breached, is in default, may not be renewed or that a consent would be required as a result of the transactions contemplated by this Agreement.

## 6.   CONDITIONS PRECEDENT TO CLOSING.

**6.1**   Conditions Precedent to Obligations of Purchaser.  The obligation of Purchaser under this Agreement to consummate the transactions contemplated by this Agreement on the Closing Date shall be subject to the satisfaction, at or prior to the Closing Date, of all of the following conditions, any one or more of which may be waived by Purchaser:

**(a)**   Representations and Warranties Accurate.   The representations and warranties of Seller contained in this Agreement which are qualified as to materiality shall be correct and complete in all respects, and those not so qualified shall be correct and complete in all material respects, as of the Closing Date with the same force and effect as though made on and as of the Closing Date (except in any case that representations and warranties that expressly speak as of a specified date or time need only be correct and complete as of such specified date or time).

**(b)**   Performance by Seller.  Seller shall have performed and complied in all material respects with all covenants and agreements required to be performed or complied with by such Person hereunder on or prior to the Closing Date.

**(c)**   Consents.  All Consents required in connection with the consummation of the transactions contemplated by this Agreement and the Closing (including those set forth on **Schedule 6.1(c)** hereto) shall have been duly obtained, made, or given and shall be in full force and effect, without the imposition upon Purchaser or Seller of any condition, restriction or required undertaking.

**(d)**   No Legal Prohibition.  No suit, action, investigation, inquiry or other proceeding by any Governmental Entity or other Person shall have been instituted or threatened which arises out of or relates to this Agreement, or the transactions contemplated hereby and no injunction, order, decree or judgment shall have been issued and be in effect or threatened to be issued by any Governmental Entity of competent jurisdiction, and no statute, rule or regulation shall have been enacted or promulgated by any Governmental Entity and be in effect, which in each case restrains or prohibits the consummation of the transactions contemplated hereby.

**(e)**   Completion of Schedules.  Seller shall have completed and delivered the Disclosure Schedules and all other schedules to be provided pursuant to this Agreement to Purchaser, and the Disclosure Schedules and such other schedules shall be acceptable to Purchaser in its sole discretion.

(f)     <u>No Material Adverse Effect</u>. No Material Adverse Effect shall have occurred and no other event, loss, damage, condition, or state of facts of any kind shall exist which has a Material Adverse Effect or can reasonably be expected to have a Material Adverse Effect.

(g)     <u>Additional Documents, etc</u>. There shall have been delivered to Purchaser each of the agreements, documents, certificates, and other items set forth **on Schedule 6.1(g)** of this Agreement, including those required by **Section 2.6** of this Agreement.

(h)     <u>Entry of Order; Appeal</u>. The Bankruptcy Court shall have entered the Sale Approval Order in accordance with **Section 5.4(c)** and any other order in accordance with **Section 5.4(d)** relating to the assignment of the Assumed Contracts, all in form and substance acceptable to Purchaser, and the Sale Approval Order and any other order in accordance with **Section 5.4(d)** relating to the assignment of the Assumed Contracts, shall not have been stayed.

**6.2**     <u>Conditions Precedent to Obligations of Seller</u>. The obligations of Seller under this Agreement to consummate the transactions contemplated by this Agreement on the Closing Date shall be subject to the satisfaction, at or prior to the Closing Date, of all of the following conditions, any one or more of which may be waived by Seller:

(a)     <u>Representations and Warranties Accurate</u>. The representations and warranties of Purchaser contained in this Agreement which are qualified as to materiality shall be correct and complete in all respects, and those not so qualified shall be correct and complete in all material respects, as of the Closing Date with the same force and effect as though made on and as of the Closing Date (except in any case that representations and warranties that expressly speak as of a specified date or time need only be correct and complete as of such specified date or time).

(b)     <u>Performance by Purchaser</u>. Purchaser shall have performed and complied in all material respects with all covenants and agreements required to be performed or complied with by such Person hereunder on or prior to the Closing Date.

(c)     <u>Consents</u>. All Consents required to be obtained by Purchaser in connection with the purchase and sale of the Purchased Assets and the Closing shall have been duly obtained, made or given and shall be in full force and effect.

(d)     <u>No Legal Prohibition</u>. No suit, action, investigation, inquiry or other proceeding by any Governmental Entity or other Person shall have been instituted or threatened which arises out of or relates to this Agreement or the transactions contemplated hereby and no injunction, order, decree or judgment shall have been issued and be in effect or threatened to be issued by any Governmental Entity of competent jurisdiction, and no statute, rule or regulation shall have been enacted or promulgated by any Governmental Entity and be in effect, which in each case restrains or prohibits the consummation of the transactions contemplated hereby.

(e)     <u>Additional Documents, etc</u>. There shall have been delivered to Seller each of the agreements, documents and other items set forth on **Schedule 6.1(g)** of this Agreement to be delivered to Seller, including those required by **Section 2.6** of this Agreement.

**6.3**     <u>Entry of Order; Appeal</u>. The Sale Approval Order shall have been entered by the Bankruptcy Court and shall not have been stayed. If an appeal of the Sale Approval Order is filed,

Seller shall be obligated to proceed with the Closing notwithstanding the pendency of any such appeal, unless the Sale Approval Order is stayed.

7.    **MISCELLANEOUS**

    **7.1**    Termination.    This Agreement may be terminated, and the transactions contemplated herein may be abandoned:

        **(a)**    any time before the Closing, by mutual written agreement of Seller and Purchaser; or

        **(b)**    any time before the Closing, by Seller, on the one hand, or Purchaser, on the other hand, (i) in the event of a material breach hereof by any non-terminating party if such non-terminating party fails to cure such breach within five (5) Business Days following notification thereof by the terminating party, or (ii) upon notification to the non-terminating party by the terminating party that the satisfaction of any condition to the terminating party's obligations under this Agreement becomes impossible or impracticable with the use of commercially reasonable efforts if the failure of such condition to be satisfied is not caused by a breach hereof by the terminating party.

        **(c)**    after the Auction, if Seller enters into a definitive agreement with respect to an Alternative Transaction because Purchaser is not the Successful Bidder at the Auction; provided, however, that if Purchaser is the Next Highest Bidder, then Purchaser may not terminate this Agreement or withdraw its irrevocable offer unless and until such Alternative Transaction has closed.

    **7.2**    Effect of Termination.

        **(a)**    If this Agreement is validly terminated pursuant to **Section 7.1**, this Agreement will forthwith become null and void, and there will be no liability or obligation on the part of any party (or any of their respective officers, directors, employees, partners, agents or other representatives or Affiliates), except that the provisions with respect to expenses in **Section 7.3** will continue to apply following any such termination.

        **(b)**    Notwithstanding the provisions of **Section 7.2(a)**, above:

            **(i)**    if Purchaser or Seller terminate this Agreement pursuant to **Section 7.1(a)**, Purchaser shall receive, as its sole and exclusive remedy available under any Law, including the Bankruptcy Code, the prompt return of the Deposit;

            **(ii)**    if Purchaser terminates this Agreement pursuant to **Section 7.1(b)(i)** or Seller terminates this Agreement pursuant to **Section 7.1(b)(ii)**, Purchaser shall receive, as its sole and exclusive remedy available under any Law, including the Bankruptcy Code, the prompt return of the Deposit;

            **(iii)**    if Seller terminates this Agreement pursuant to **Section 7.1(b)(i)** or Purchaser terminates this Agreement pursuant to **Section 7.1(b)(ii)**, Seller shall receive, as its sole and exclusive remedy available under any Law, including the Bankruptcy Code, the Deposit.

**7.3**    <u>Expenses</u>. Except as otherwise set forth herein, each party hereto shall pay its own expenses incurred in connection with this Agreement and the transactions contemplated hereby.

**7.4**    <u>Compliance with Laws</u>. Notwithstanding anything contained in this Agreement to the contrary, the obligations of the parties shall be subject to all laws, present and future, of any government having jurisdiction over the parties and this transaction, and to orders, regulations, directions or requests of any such government.

**7.5**    <u>Further Cooperation</u>.

(a)    <u>Further Cooperation</u>. At the request and expense of Purchaser, at any time following the Closing Date, Seller shall execute and deliver such other instruments and documents and do and perform such other acts as may be reasonably necessary for the operation of the Business by Purchaser and effecting completely the consummation of the transactions contemplated hereby, including execution, acknowledgment and recordation of other such papers, using reasonable efforts to obtain the same from the respective inventors or authors as necessary for perfecting and conveying unto Purchaser the benefit of the transactions contemplated hereby; provided, however, that Seller shall not be obligated to pay any consideration or incur any costs to provide such cooperation.

(b)    <u>Reasonable Access to Records and Certain Personnel, Etc</u>. In order to facilitate Seller's efforts to administer and close the Bankruptcy Case (including, without limitation, the preparation of filings in the Bankruptcy Case and state, local and federal tax returns and other filings, reconciliation of claims filed in the Bankruptcy Case), removal of corporate and other records and information relating or belonging to entities other than Debtor, until the date on which Debtor's chapter 7 case is closed, (i) Purchaser shall permit Seller's counsel, any representative of Seller, and other professionals and counsel for any successor to Seller and their respective professionals (collectively, **"Permitted Access Parties"**) reasonable access to the financial and other books and records relating to the Purchased Assets or the Debtor's business and the systems containing such information, books and records, which access shall include the right of such Permitted Access Parties to copy or remove, as applicable (at the option of Purchaser), at such Permitted Access Parties' expense, such documents and records as they may request solely for the purposes described above and subject to an appropriate confidentiality agreement, and (ii) Purchaser shall permit the Permitted Access Parties reasonable access to Purchaser's employees free of charge with respect to the foregoing matters up to a period of 26 weeks, provided that such access does not interfere with the duties, obligations and performance such employees owe to Purchaser or its designees.

**7.6**    <u>Governing Law; Jurisdiction</u>. All disputes arising out of or related to this Agreement, including, without limitation, any dispute relating to the interpretation, meaning or effect of any provision hereof, will be resolved in the Bankruptcy Court and the parties hereto each irrevocably submit to the exclusive jurisdiction of the Bankruptcy Court for the purposes of adjudicating any such dispute, to the extent the jurisdiction of the Bankruptcy Court is applicable. If the jurisdiction of the Bankruptcy Court is not applicable, any legal action, suit or proceeding arising out of or relating to this Agreement, each and every agreement and instrument contemplated hereby or the transactions contemplated hereby and thereby shall be instituted in any court in the State of Delaware, and in that event each of the parties irrevocably submits to the

exclusive jurisdiction of the courts of the State of Delaware for the purposes of adjudicating such a dispute. This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware (*i.e.*, without regard to its conflicts of law rules).

    **7.7** <u>Entire Agreement; Interpretation</u>. The terms and conditions of this Agreement, including its exhibits and the Ancillary Agreements, constitute the entire agreement between the parties with respect to the subject matter hereof, and merge and supersede all prior and contemporaneous agreements, understandings, negotiations, and discussions. Neither of the parties shall be bound by any conditions, definitions, warranties, understandings, or representations with respect to the subject matter hereof other than as expressly provided herein. The section headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement. No oral explanation or oral information by either party hereto shall alter the meaning or interpretation of this Agreement. The terms "includes" and "including" are not limiting. These terms and conditions will prevail notwithstanding any different, conflicting, or additional terms and conditions which may appear on any acknowledgment or other writing not expressly incorporated into this Agreement. Unless a contrary intention appears, (i) the words "herein", "hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular Article, Section or other subdivision, and to any certificates delivered pursuant hereto; and (ii) reference to any Article or Section means such Article or Section hereof. Any accounting terms used in this Agreement shall, unless otherwise defined in this Agreement, have the meaning ascribed thereto by GAAP.

    **7.8** <u>Notices</u>. All notices required or permitted to be given hereunder shall be in writing, shall make reference to this Agreement, and shall be delivered by hand, email, or dispatched by prepaid air courier or by registered or certified airmail, postage prepaid, addressed as follows:

If to Purchaser:

Urbana Partners, LLC
c/o Morris Legal Corp.
Attn: Patrick R. Morris, Esq.
1441 Broadway, 3rd Floor
New York, NY 10018
Telephone: (646) 692-4012
Email: prm@patrickmorrislaw.com

If to Seller:

George L. Miller, Chapter 7 Trustee
8 Penn Center, Suite 950
1628 John F. Kennedy Boulevard
Philadelphia, PA 19103
Telephone: (215) 561-0950
Email: gmiller@mctllp.com

18

with a copy to:

Saul Ewing LLP
Attn: Evan T. Miller, Esq.
1201 North Market Street, Suite 2300
Wilmington, DE 19801
Telephone: (302) 421-6864
Email: evan.miller@saul.com

-and-

Saul Ewing LLP
Attn: Jorge Garcia, Esq.
701 Brickell Avenue, Suite 1700
Miami, FL 33131
Telephone: (305) 428-4500
Email: jorge.garcia@saul.com

Such notices shall be deemed served when received by addressee or, if delivery is not accomplished by reason of some fault of the addressee, when tendered for delivery. Either party may give written notice of a change of address and, after notice of such change has been received, any notice or request shall thereafter be given to such party at such changed address.

**7.9**   Counterparts.  This Agreement may be executed in one or more counterparts, each of which when executed shall be deemed to be an original but all of which taken together shall constitute one and the same agreement.  Counterparts may be delivered via facsimile, electronic mail (including pdf or any electronic signature complying with the U.S. federal ESIGN Act of 2000, Uniform Electronic Transactions Act or other applicable law) or other transmission method and any counterpart so delivered will be deemed to have been duly and validly delivered and be valid and effective for all purposes.

**7.10**   No Ongoing Obligations.  Purchaser shall not have any obligations solely by virtue of the provisions of this Agreement to support, maintain or otherwise continue the business operations of Seller or to otherwise market, promote or develop the Purchased Assets after the Closing Date.

**7.11**   Survival of Representations and Warranties.  None of the representations and warranties of Seller contained in this Agreement, other than those set forth in Section 3.1 and 3.4, shall survive beyond the Closing Date.  None of the representations and warranties of Purchaser contained in this Agreement, other than those set forth in Section 4.1, 4.2 and 4.4, shall survive beyond the Closing Date.

**7.12**   Amendment.  This Agreement may not be amended or modified except by an instrument in writing signed by, or on behalf of, Seller and Purchaser.

**7.13**   Purchaser Indemnification Obligation.  After the Closing, Purchaser shall indemnify Seller against and shall hold it harmless from any and all liabilities, losses, damages,

costs and expenses (including, without limitation, reasonable attorneys' fees and expenses) that Seller may suffer or incur by reason of (i) Seller's defense of any claim, suit or proceeding made or commenced against it arising out of obligations of Debtor that were expressly assumed by Purchaser hereunder and only expressly for liabilities, claims or amounts arising or accruing after the Closing Date; or (ii) any finder's fee or broker's fees incurred by Seller in connection with the transactions contemplated hereby, other than expressly provided for herein. Seller shall provide written notice to Purchaser of any claim or dispute as to which indemnification is provided under this Section within ten (10) days of receipt of written notice by Seller of the commencement, or threatened commencement, of any such action; provided that the failure to provide such notice will not affect any rights hereunder except to the extent Purchaser is materially prejudiced thereby. Seller, on not less than thirty (30) days' notice to Purchaser, may make settlement of such claim, litigation or other proceeding with Purchaser's consent, such consent not to be unreasonably withheld, and such settlement shall be binding on Seller and Purchaser for the purposes of this Section; provided, however, that, if within said thirty-day period Purchaser shall, in writing, have requested Seller to contest such claim, or to defend against such litigation or other proceeding, then Purchaser shall have the right and obligation to contest such claim or to defend against such litigation or other proceeding on its own behalf and on behalf of Seller, with counsel of its own choosing, but Seller may also, in its discretion, participate in such contest or defense on its own behalf and with counsel of its own choosing. If Purchaser shall have failed, neglected or refused to contest such claim or to defend against such litigation or other proceeding, Purchaser shall reimburse Seller for the expenses incurred by Seller in such contest or defense. Any payment or settlement resulting from such contest or defense, together with Seller's costs thereof, shall be binding on Seller and on Purchaser for the purposes of this Section.

**7.14** <u>No Agency</u>. The parties hereto are independent contractors. Except as may be provided in this Agreement, neither party has any express or implied right or authority to assume or create any obligations on behalf of the other or to bind the other to any contract, agreement or undertaking with any third party. Nothing in this Agreement shall be construed to create a partnership, joint venture, employment or agency relationship between Seller and Purchaser.

**7.15** <u>Specific Performance</u>. Notwithstanding anything to the contrary contained herein (other than **Section 7.2(b)** hereof), each party hereto acknowledges that money damages would be incalculable and an insufficient remedy for any breach of this Agreement by such party and that any such breach would cause the other party hereto irreparable harm. Accordingly, each party hereto also agrees that, in the event of any breach or threatened breach of the provisions of this Agreement by such party, the other party hereto shall (except to the extent **Section 7.2(b)** is applicable) be entitled to equitable relief without the requirement of posting a bond or other security, including in the form of injunctions and orders for specific performance.

**7.16** <u>Severability</u>. Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall not invalidate the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction, and any such provision, to the extent invalid or unenforceable, shall be replaced by a valid and enforceable provision which comes closest to the intention of the parties underlying such invalid or unenforceable provision.

**7.17**   Waivers.   Waiver by any party of any breach of or failure to comply with any provision of this Agreement by the other party shall not be construed as, or constitute, a continuing waiver of such provision, or a waiver of any other breach of, or failure to comply with, any other provision of this Agreement.   No waiver of any such breach or failure or of any term or condition of this Agreement shall be effective unless in a written notice signed by the waiving party and delivered, in the manner required for notices generally, to each affected party.

**7.18**   Binding Effect; Third Party Beneficiaries; Assignment.   This Agreement shall be binding upon, inure to the benefit of, and be enforceable by, the parties hereto and their respective successors and permitted assigns.   Except as expressly set forth herein, nothing expressed or referred to in this Agreement is intended or shall be construed to give any Person other than the parties to this Agreement, or their respective legal representatives, successors and permitted assigns, any legal or equitable right, remedy or claim under or in respect of this Agreement or any provision contained herein.   Neither party may assign this Agreement nor any of its rights hereunder, other than any right to payment of a liquidated sum, nor delegate any of its obligations hereunder, without the prior written consent of the other, except that Purchaser may assign its rights under this Agreement to any Affiliate or to any Person providing financing for the transaction.

**7.19**   Knowledge Qualifications.   Except as otherwise provided in this Agreement, whenever any party makes any representation, warranty or other statement to such party's knowledge, such party will be deemed to have made due inquiry into the subject matter of such representation, warranty or other statement, including due inquiry of each officer and director of such party as well as any other person who has responsibility with respect to the relevant subject matter.

*[Remainder of Page Intentionally Left Blank]*

IN WITNESS WHEREOF, the parties have executed this Asset Purchase Agreement as of the date first written above:

**Seller:**

**IPwe, Inc.**

By: _____

Name: George L. Miller

Title:   Chapter 7 Trustee of IPWe, Inc.

**Purchaser:**

**Urbana Partners, LLC**

By: _____
DocuSigned by:
David Katz
99DB5FDF720E40A...

Name:  David J. Katz

Title: Secretary and Authorized Signatory

22

## SCHEDULE 1

### Purchased Assets

*Some Purchased Assets described in this Schedule may contain third-party intellectual property that may have been licensed by, or otherwise acquired, by Seller. Purchaser acknowledges that Seller may be unable to transfer certain intellectual property belonging to a third party without the express written consent of that third party, which shall not be obtained or sought by Seller as part of this Agreement. Purchaser accepts full responsibility for communicating with any such third parties whose intellectual property may be included in the Purchased Assets, and Purchaser shall be responsible for paying all licensing fees, costs, expenses, or other charges associated with using such Purchased Assets.*

All of Seller's right, title, and interest in (1) all intellectual property (including, without limitation, all patents, patent applications, object and source code, service marks, copyrights, and trademarks (together with associated goodwill) (collectively, the "IP"), (2) all technical documents for, or related to, the IP, (3) all books and records related to the Purchased Assets, and (4) any and all good will.

## EXHIBIT A

## BILL OF SALE

For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, **IPwe, Inc.**, by and through George L. Miller as Chapter 7 Trustee for the Estate of IPwe, Inc. ("**Seller**"), hereby sells, assigns, bargains, transfers, conveys, and delivers all of its right, title, and interest, in, to and under the Purchased Assets (as such term is defined in that certain Asset Purchase Agreement, dated as of July 16, 2024 by and between Seller and Purchaser (the "**Asset Purchase Agreement**"), of the Seller to Urbana Partners, LLC ("**Purchaser**").

EXCEPT AS SET FORTH IN THE ASSET PURCHASE AGREEMENT, SUCH ASSETS ARE CONVEYED "AS IS" WITHOUT ANY WARRANTIES OF ANY KIND, EXPRESS OR IMPLIED, INCLUDING ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, PURSUANT TO THE ASSET PURCHASE AGREEMENT.

Dated this July 25, 2024

In the presence of

ASSIGNOR:

George L. Miller, solely in his Capacity as Chapter 7 Trustee for the Estate of IPwe, Inc.

By: _____

Name: George L. Miller, solely in his Capacity as Chapter 7 Trustee for the Estate of IPwe, Inc.

Docusign Envelope ID: 2645ABA9-0F2F-402F-A5C6-FAA3D7CEEA0E

**EXHIBIT B**

**Sale Approval Order**